IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WENDY SCHRAMM,

        Plaintiff,

   v.

CNA FINANCIAL CORP. INSURED GROUP
BENEFITS PROGRAM,

       Defendant.

_____/

No. 09-03087 CW

ORDER GRANTING
PLAINTIFF'S
MOTION FOR
JUDGMENT AND
DENYING
DEFENDANT'S
CROSS-MOTION FOR
JUDGMENT
(Docket Nos. 28
and 36)

    Plaintiff Wendy Schramm moves for judgment on her claims under the Employee Retirement Income Security Act (ERISA). Defendant CNA Long Term Disability Program, erroneously sued as CNA Financial Corp. Insured Group Benefits Program, opposes Plaintiff's motion and cross-moves for judgment on her claims. Plaintiff opposes the cross-motion. The motions were heard on April 15, 2010. Having considered oral argument and all of the papers submitted by the parties, the Court GRANTS Plaintiff's motion for judgment and DENIES Defendant's cross-motion for judgment.

FINDINGS OF FACT

I. Plaintiff's Employment and Educational Background

    For more than thirty years, Plaintiff worked in vocational rehabilitation, spending more than ten years in the insurance industry. She has a bachelor of arts degree in sociology and a master of science degree in rehabilitation administration.

    From 2001 to 2005, Plaintiff worked as a Vocational

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Rehabilitation Case Manager for CNA Financial Corporation.  Her

primary duties were to review claims and provide vocational and

rehabilitation services to claimants, with the goal of facilitating

"the claimant's return to work in their own occupation or any

occupation which is physically appropriate."  AR446.  As an

employee, Plaintiff participated in the CNA Long Term Disability

Program.  At the time Plaintiff filed her claim for benefits,

Hartford Life and Accident Insurance Company administered the

Program.[1]

     At the suggestion of her doctors, Plaintiff stopped working

for CNA on February 15, 2005.

II.  Policy Terms

     Under the Program's policy, an employee is considered disabled

for the purposes of receiving benefits if he or she satisfies the

"Occupation Qualifier or the Earnings Qualifier," which, in

relevant part, are defined as follows:

> Occupation Qualifier . . .
> After the <u>Monthly Benefit</u> has been payable for 12 months,
> "<u>Disability</u>" means that <u>Injury</u> or <u>Sickness</u> causes
> physical impairment to such a degree of severity that <u>You</u>
> are:
>
> 1.   continuously unable to engage in any occupation for
>      which <u>You</u> are or become qualified by education,
>      training or experience; and
>
> 2.   not working for wages in any occupation for which
>      <u>You</u> are or become qualified by education, training
>      or experience.
>
> Earnings Qualifier
> <u>You</u> may be considered <u>Disabled</u> during and after the
> <u>Elimination Period</u> in any in which <u>You</u> are <u>Gainfully</u>

---

     [1] The Court hereinafter refers to the actions of Hartford as
those of Defendant.

2

**United States District Court**
For the Northern District of California

Employed,[2] if an <u>Injury</u> or <u>Sickness</u> is causing physical
or mental impairment to such a degree of severity that
<u>You</u> are unable to earn more than 80% of <u>Your Monthly
Earnings</u> in any occupation for which <u>You</u> are qualified by
education, training or experience.  On each anniversary
of <u>Your Disability</u>, <u>We</u> will increase the <u>Monthly Earnings</u>
by the lesser of the current annual percentage increase
in CPI-W, or 10%. . . .

Roberts Decl., Ex. 1 at POL10-11 (emphasis in original).

To file a claim under the policy, an insured must provide
"Proof of Disability."  <u>Id.</u> at POL16-17.  The policy also contains
a provision for "Continuing Proof of Disability," which states:

<u>You</u> may be asked to submit proof that <u>You</u> continue to be
<u>Disabled</u> and are continuing to receive <u>Appropriate and
Regular Care of a Doctor</u>.  Requests of this nature will
only be as often as <u>We</u> feel reasonably necessary.  If so,
this will be at <u>Your</u> expense and must be received within
30 days of <u>Our</u> request.

<u>Id.</u> at POL17 (emphasis in original).

III. Plaintiff's Car Accident and Initial Medical Assessments

In June, 2004, Plaintiff was involved in an automobile
accident.  Her vehicle was rear-ended by a car traveling at
approximately sixty miles per hour.  After the accident, Plaintiff
reported pain in her shoulder, neck and back.

In October, 2004, Dr. Gary Schneiderman, an orthopedic
surgeon, examined Plaintiff.  He noted that Plaintiff had
hypertension, diabetes and carpal tunnel syndrome, which was

---

[2] The policy defines "Gainfully Employed" as:

the performance of any occupation for wages, remuneration
or profit, for which <u>You</u> are qualified by education,
training or experience on a full-time or part-time basis,
for the Employer or another employer, and which <u>We</u>
approve and for which <u>We</u> reserve the right to modify
approval in the future.

Roberts Decl., Ex. 1 at POL20.

3

diagnosed in 1992.  He also reviewed magnetic resonance imaging (MRI) scans of Plaintiff's spine, taken on September 30, 2004.  He observed that Plaintiff had "a very large herniation" in her cervical spine, "which compresses the spinal cord and nerve root foramen."  Administrative Record (AR) at 715.  Dr. Schneiderman was not certain whether this herniation required surgery.  In her thoracic spine, Dr. Schneiderman found another herniation, which caused a slight displacement of Plaintiff's spinal cord.  He did not believe that this herniation warranted surgery and stated it "should improve over time; although it may take a number of months."  AR716.

In February, 2005, Dr. James Zucherman, a specialist in orthopedic surgery, examined Plaintiff.  Dr. Zucherman observed disc protrusion in Plaintiff's thoracic and cervical spines and reiterated that Plaintiff had carpal tunnel syndrome.  He advised Plaintiff to stop working, which she did as of February 15, 2005.

On March 25, 2005, Dr. Zucherman examined Plaintiff again.  He noted that Plaintiff was being treated for "diabetes and hypertension, which have been somewhat out of control . . . ." AR755.  Concerning her spine, Dr. Zucherman stated, "Although . . . Mrs. Schramm has severe stenosis with spinal cord encroachment, she does not have long tract signs and she reports some slow improvement recently."  Id.  He reviewed MRI scans of Plaintiff's cervical spine and observed disc protrusion, spinal stenosis and degenerative disc disease.  Dr. Zucherman stated that Plaintiff "may return to work in 3 months."  AR756.  He further explained that Plaintiff "is not permanent and stationary, but is temporarily

United States District Court
For the Northern District of California

4

totally disabled."  AR756.  Plaintiff was certified to be "off work until July 1, 2005."  AR694.

IV.  Defendant Approves Disability Benefits

On July 18, 2005, Defendant approved Plaintiff's claim for short-term disability benefits.  Then, as of August 17, 2005, Plaintiff became eligible for long-term disability benefits. Around the same time, Plaintiff also sought workers' compensation benefits.

V.  Plaintiff's Care by Dr. Thomas Pattison

From November, 2005 through the summer of 2007, Plaintiff received care from Dr. Thomas Pattison, a specialist in physical medicine and rehabilitation.

At a November 23, 2005 consultation, Plaintiff complained of "numbness and tingling in both upper extremities, as well as the cervical, thoracic and low back regions."  AR590.  Reviewing the March, 2005 MRI images of Plaintiff's spine, Dr. Pattison reported that she "has very significant findings."  AR594.  In particular, he observed "significant confluent disc extrusions at C5-6 or C6-7" and the "encroachment of the spinal canal," which was discussed by Dr. Schneiderman in his report.  AR593.  The scans of the lumbar and thoracic sections of Plaintiff's spine showed mild and scattered degenerative changes.  In assessing Plaintiff's neck motion, he observed results below expected values.  Based on his observations, Dr. Pattison had the following impressions:

    1.  Cervical Disc Disease with Central stenosis and
        possible component of Myelopathy - 722.71
    2.  Possible Cervical Radiculitis in C5 or C6 on the
        Left associated with Left Shoulder Weakness - 723.4
    3.  Rule out Rotator Cuff Tear in association with Left

United States District Court
For the Northern District of California

```
                    Shoulder Weakness.
          4.   Sprain of Lumbar Region - 847.2
          5.   Some features of a Post Traumatic Stress disorder
               possibly combined with some underlying Anxiety and
               Depression.
          6.   Late Effects Sprain/Strain - 905.7
          7.   Traumatic Thigh Left - 716.15
          8.   Probable Progressive Polyneuropathy - 356.4
          9.   Right greater than left carpal tunnel syndrome.
          10.  Diabetes.
          11.  Hypertension.
          12.  Obesity.
```

AR593. Dr. Pattison suggested that Plaintiff should undergo additional tests for her shoulder and back injuries and her carpal tunnel syndrome. He also recommended further physical therapy, through which he believed she could make "significant progress." AR595.

On December 12, 2005, Dr. Pattison conducted electro-diagnostic studies of Plaintiff, which confirmed that she had carpal tunnel syndrome. Dr. Pattison stated that Plaintiff "has electrodiagnostic evidence of a peripheral neuropathy, given the abnormalities in multiple limbs." AR586. He also observed "moderate to severe focal median nerve dysfunction on the right and slight focal median nerve dysfunction on the left." Id.

At a visit on December 28, 2005, Plaintiff reported feeling better, which she attributed to her physical therapy. Dr. Pattison stated that Plaintiff would continue with therapy, although he expressed concern about Plaintiff causing further injury to herself. He discussed with Plaintiff the need to "balance the activities of daily living with the degree of fitness, as not to injure the disc structures further." AR578. To restore Plaintiff's "functional capacity," Dr. Pattison recommended that

she continue physical therapy "for the next month at a frequency of one to two times a week." AR579. He opined that Plaintiff may be a "surgical candidate" for her pain, but Plaintiff stated that she wanted to "proceed very conservatively due to her comorbid diagnosis of diabetes." Id. Because of her other conditions, Plaintiff did not want any invasive treatment, such as an injection to her shoulder.

On February 25, 2006, apparently in response to an inquiry from Defendant, Dr. Pattison reported that Plaintiff "has a number of medical problems that have interrupted her physical therapy." AR531. He stated that Plaintiff was still undergoing additional study and, thus, it had "been somewhat difficult to opine [on] her exact [temporary total disability] status on a more objective basis." AR531. Dr. Pattison stated that he was relying on Plaintiff's subjective reports of her inability to work.

At a visit on March 16, 2006, Plaintiff again reported that physical therapy had been helping, "particularly with some functional tasks." AR526. However, she also complained of "widespread body pain," particularly in her left shoulder. Id. Dr. Pattison continued to observe "some significant limitations in neck range of motion." Id. He explained that Plaintiff had "rather severe degenerative changes in her neck," although they were "stable and were addressed by Dr. Zucherman." AR527. He proposed an injection to Plaintiff's left shoulder, presumably to alleviate her pain. However, Plaintiff reiterated her aversion to this course of action, to which Dr. Pattison noted that "there have been a lot of delays in this case already." AR527. He stated that

7

Plaintiff had missed several of her physical therapy sessions for various reasons, "some of which relate to the diabetic situation." Id. Dr. Pattison expressed concern about Plaintiff's belief "that she can case manage" her condition on her own and recommended that a nurse case manager be used.  AR528.  He opined that "follow up here has been quite erratic and is contributing to a less than optimal outcome." Id.  He acknowledged the insurer's concern over Plaintiff's continued absence from work, and suggested that she be offered a "modified duty arrangement."  Id.  He stated,

> I am concerned that her work status is based much more on
> her subjectives than objectives, but this has been a
> little hard to sort out.  Again, I note that she has a
> high level of objective findings in the cervical spine
> that does not seem to correlate temporally to her absence
> from work.  She does have a very long commute, but it is
> my understanding that this would not be a factor
> in determining her ability to be off work.

Id.

On May 16, 2006, Plaintiff reported improvements in her neck and shoulder and that she was having less trouble sleeping.  Her neck continued to have a limited range of motion, but her shoulder demonstrated an improved range.  Concerning Plaintiff's ability to work, Dr. Pattison stated:

> I do agree light duty would be appropriate for her.  When
> I have brought up this contentious subject before, I was
> met with some concerns about how she cannot drive down
> there, she cannot sit or stand for long periods of time,
> or various other difficulties.  I did remind her that she
> took a trip to Reno and that is quite an arduous drive
> over the mountains.  Thus, it would seem that she could
> do some light work based on all the factors available to
> me.  Thus, I did put her back on modified duty although
> she seemed unhappy about that and I got a call later on
> in the day which I have not responded to yet . . . .

AR495-96.

United States District Court
For the Northern District of California

8

Dr. Pattison filed a "permanent and stationary report" on July 6, 2006.  AR467.  He provided a review of Plaintiff's medical history, reiterating many of his previous findings concerning her conditions.  He stated that Plaintiff presented "significant herniation" in her thoracic spine, although it did not appear to bother her significantly.  AR472.  With regard to her cervical spine, Dr. Pattison noted that she had "significant findings on serial MRI studies."  AR473.  He, along with Drs. Schneiderman and Zucherman, documented neurological impairment in this area. Concerning her functional capacities, Dr. Pattison stated, among other things, that Plaintiff could sit no more than six hours per day and that she "should avoid prolonged sitting as this increases her neck discomfort."  AR477.  He indicated that Plaintiff could not, at that time, return to her usual occupation.  He noted that Plaintiff felt "rather stridently that she cannot return to her usual and customary job."  AR478.  He requested a description of Plaintiff's job from her insurance carrier, presumably to determine whether Plaintiff could return to work.  He stated that Plaintiff would require "an ergonomic workstation" at any future place of employment.  AR478.

At a visit on August 7, 2006, Plaintiff felt "slightly better" and a "pain diagram" showed improvements in her level of pain and function.  AR464.  Dr. Pattison noted that Plaintiff went on a fifteen-day trip to Maine, during which "she went to Chicago and drove the rest of the way."  AR464.  He reported, "Nothing flared up too dramatically with the trip."  AR464.  Dr. Pattison encouraged Plaintiff's "re-entry into the labor force."  AR464.

Again, he requested a description of Plaintiff's job, along with "functional requirements," to determine "once and for all" whether Plaintiff was "a qualified injured worker." AR464.

Thereafter, Plaintiff's reports of her pain markedly changed. At an October 16, 2006 visit, Plaintiff reported "overall increased dysfunction and pain." AR454. She reported an inability to sleep, but, according to Dr. Pattison, she refused to undertake any tests for this problem. He observed that the range of motion of Plaintiff's shoulder had been reduced. He acknowledged that Plaintiff has "very significant multilevel cervical disc disease with some indications of an ongoing myelopathy, as well as a radiculopathy." AR454. Nevertheless, after conducting a cursory review of Plaintiff's job description, Dr. Pattison did not see anything that "would cause her not to be able to go back to work based on her current situation . . . ." AR454. He noted, with surprise, that Plaintiff had not sought treatment for her carpal tunnel syndrome, which he opined was "very fixable." AR455. He asserted that "it is a challenge to get [Plaintiff] to focus on things. I offered to send her back to St. Mary's for an updated spine evaluation. She did not see[m] that interested in doing this." AR455. Again, he reported that Plaintiff was released to work.

In a December 7, 2006 visit, Plaintiff reported "more discomfort on [her] left side, particularly her left shoulder." AR451. Dr. Pattison noted "no acute neurological deficits," although Plaintiff continued to have limited range of motion in her shoulder. Id. In his last progress report for Plaintiff's state

10

**United States District Court**
For the Northern District of California

workers' compensation claim, Dr. Pattison reported that Plaintiff had: "Cervical Disc with Myelopathy, Cervical Radiculitis, Sprain of Lumbar Region, Late Effects Sprain/Strain, Traumatic Thigh Left." _Id._

On December 9, 2006, Dr. Pattison filed a report, detailing his opinion on Plaintiff's ability to return to her position with CNA. He reviewed an analysis of the job, prepared by a third-party on behalf of CNA, and Plaintiff's written comments. He reiterated that Plaintiff was limited to lifting no more than twenty pounds. He noted that Plaintiff claimed that she was required to carry thirty pounds at her job, notwithstanding CNA's assertion that her lifting was limited to twenty pounds. He also stated that Plaintiff's carpal tunnel syndrome would "play a role in her ability to perform frequent keyboarding and grasping activities" and that until it "gets treated, she would not be able to return to her usual and customary job." AR437. He noted that Plaintiff raised complaints about her hypertension, diabetes and sleep problems, which, taken in combination with her orthopedic issues, "may well preclude her from participating in her usual and customary job." _Id._ He declined to opine on these non-orthopedic issues because they were outside the scope of his specialty. He repeated his concern about Plaintiff refusing to seek care for her sleep difficulties.

VI.  Qualified Medical Examination by Dr. Edwin Clark

On May 14, 2007, Dr. Edwin Clark, a board-certified orthopedic surgeon, conducted an in-person evaluation of Plaintiff, which was required as part of her workers' compensation claim. Dr. Clark did

11

not review Plaintiff's medical records.

Dr. Clark diagnosed Plaintiff with:

1.   Cervical dorsal lumbar sprain/strain, status post
     motor vehicle accident.
2.   No objective findings of radiculopathy, i.e.,
     reflex, motor, or sensory changes in the upper or
     lower extremities.
3.   Cervical lumbar spondylosis, preexisting on a more
     probable than not basis.
4.   Left shoulder contusion, sprain, with residual
     biceps tendinitis.  No objective findings or
     shoulder impingement testing.
5.   Provocative testing for carpal tunnel syndrome
     bilaterally negative.
6.   Diabetes mellitus.
7.   Exogenous obesity.

AR432.  He concluded that Plaintiff could perform "light work," but

that she should be restricted from heavy lifting, repetitive

bending and stooping.  Id.  She also could not sustain activity "at

or above shoulder level for the left shoulder."  AR432.  Unlike Dr.

Pattison, Dr. Clark did not suggest any restrictions for

Plaintiff's wrists or hands.

VII. Care by Dr. Cheryl Matossian

On September 12, 2007, Dr. Matossian began treating Plaintiff

for her spinal and shoulder injuries, presumably after Plaintiff

left the care of Dr. Pattison.  Although she had been Plaintiff's

primary care physician since January, 2005, the scope of Dr.

Matossian's care was initially limited to managing Plaintiff's

diabetes and hypertension.

In November, 2007, Dr. Matossian diagnosed Plaintiff with:

1.   Rotator cuff tendonitis / possible tear of the
     supra- and infraspinatus tendons
2.   Subacromial bursitis
3.   Cervical disc degeneration
4.   Thoracic disc degeneration
5.   Bulging disc (C5 - C6)

12

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

```
6.    Bulging disc (T7 – T8)
7.    Cervical spondylosis
8.    Acquired spondylolisthesis: L5-S1, first degree, on
      3/05 mri
9.    Carpal tunnel syndrome, s/p recent decompression.
```

AR370-71.

In a "Medical Source Statement," dated November 19, 2007, Dr. Matossian stated that shoulder and lower back pain limited Plaintiff's functioning.  Plaintiff could lift no more than ten pounds.  She could stand or walk no more than two hours in an eight-hour work day, although after one hour, Plaintiff's pain would worsen.  Plaintiff could sit three to three-and-a-half hours per day, but no more than one hour at a time.  Dr. Matossian did not cite any evidence other than Plaintiff's reports of pain.

In a November 21, 2007 report to Defendant, Dr. Matossian reiterated many of the limits she stated previously: Plaintiff could sit no more than one hour at a time, and for no more than three to three-and-a-half hours per day; she could not stand for more than fifteen to thirty minutes at a time, and for no more than one to one-and-a-half hours per day; and she could walk for forty-five minutes to one hour at a time, but no more than two to two-and-a-half hours per day.  Dr. Matossian stated that Plaintiff could participate in vocational rehabilitation services, but that she would be unable to work a full eight-hour workday.

VIII. Termination of Plaintiff's Benefits

Rowena Buckley, a nurse for Defendant, performed a "Functional Assessment" of Plaintiff based on her claims file.  In particular, Ms. Buckley evaluated the reasonableness of the restrictions and limitations imposed by Dr. Matossian on Plaintiff.  Ms. Buckley

13

interpreted Dr. Matossian's November, 2007 reports to state that Plaintiff could not work a full eight-hour workday.  She also read Dr. Matossian to "give functionality for at least 6 hours of function," although Ms. Buckley noted that this was before Plaintiff's second carpal tunnel surgery.  FN23.  Ms. Buckley concluded that Dr. Matossian's restrictions and limitations "seem reasonable given the chronicity of [Plaintiff's] complaints, her advancing years and progressive degenerative arthritis, comorbid condition of diabetes and neuropathy, as well as the inherent limitations associated with bilateral carpal tunnel surgery . . . ."  Id.

Susan Marquis completed an "Employability Analysis Report" for Plaintiff on April 23, 2008.  Ms. Marquis construed Dr. Matossian's reports to state that Plaintiff could "sit 3 to 3.5 hours/workday; stand 1 to 1.5 hours/workday; and walk 2 to 2.5 hours/workday." AR284.  She also interpreted the reports to state that Plaintiff could work a thirty-hour workweek, or six hours per day.  Id.  As suggested by Ms. Buckley's comments above, this number appears to be the sum of the hours of functionality listed by Dr. Matossian. However, Dr. Matossian's November reports did not explicitly state that Plaintiff could work a six-hour workday or a thirty-hour workweek.  Using the "Occupational Access System," which was adjusted to "reflect the sedentary physical ability provided by" Dr. Matossian, Ms. Marquis determined that there were four occupations appropriate for Plaintiff: counselor, job development specialist, field director or employment agency manager.

On April 28, 2008, Defendant notified Plaintiff that she did

United States District Court
For the Northern District of California

not meet the Program's definition of "Disability."  AR268.
Accordingly, her long-term disability benefits ended on May 1,
2008.  Defendant stated that it relied on:

> The Attending Physician's Statement signed by Dr. Cheryl
> Matossian on 11/21/2007;
>
> Office notes and medical records from Dr. Cheryl
> Matossian, Family Practice from 11/19/2007;
>
> Medical records from Dr. Thomas Pattison of 12/12/2005;
>
> Medical records from Dr. Darin White of 7/19/2007;
>
> Employability Analysis information completed by a
> Vocational Rehabilitation Clinical Case Manager on
> 4/24/2008 and;
>
> Your education, training and experience described in your
> resume received 04/17/2008.

AR269.  Defendant incorporated the discussion from Ms. Marquis's
Employability Analysis Report, stating that Plaintiff could "sit 3
to 3.5 hours/workday; stand 1 to 1.5 hours/workday; and walk 2 to
2.5 hours/workday."  AR270.  Defendant also noted that Plaintiff
could work thirty hours per week; it provided Plaintiff with the
four occupations identified by Ms. Marquis.

Thereafter, because Plaintiff was not disabled under the
Program's terms, Defendant terminated her "Waiver of Premium
benefit" for her group life insurance plan.  PWAR86.

IX. Plaintiff's Part-Time Work

In August, 2008, Plaintiff began work as a Career Guidance
Technician/Job Developer at a high school in El Dorado, California.
She reported that, after beginning this part-time work, she
"noticed a decline in [her] health, with increased pain in [her]
neck, shoulder, and back . . . ."  AR204.  The administrative

United States District Court
For the Northern District of California

1  record does not contain evidence that Plaintiff has ceased to work

2  in this capacity.

3  X. Plaintiff's Appeal

4       On December 30, 2008, Plaintiff filed an appeal with Defendant

5  concerning the termination of her benefits.  Plaintiff included

6  notes from Dr. Matossian's examinations in September and October,

7  2008.  In her notes from September 9, 2008, Dr. Matossian stated

8  that Plaintiff was experiencing shoulder and neck pain that

9  prevented her from sleeping at night.  She noted that Plaintiff's

10 left shoulder had "at least a 50% loss" of range of motion.  AR199.

11 In her notes from Plaintiff's October 6, 2008 visit, Dr. Matossian

12 stated that Plaintiff's "neck and shoulder pain/limitations in

13 motion . . . limit [Plaintiff's] functional (upper extremity)

14 abilities by about 50% of normal."  AR198.

15      Plaintiff also included an interpretation of the November,

16 2008 MRI scan of her left shoulder.  According to Dr. Alan

17 Hirahara, the MRI revealed a "SLAP lesion with severe glenohumeral

18 osteoarthritic changes with significant spurring and flattening of

19 the joint."  AR188.  A "subscap tear" was also present.  Id.  Dr.

20 Hirahara stated that Plaintiff could be a candidate for

21 arthroscopic surgery in her left shoulder.  AR189.

22      Also included was a letter by Dr. Matossian, dated December

23 22, 2008.  Dr. Matossian explained that she did not intend to

24 represent, in her November, 2007 reports to Defendant, that

25 Plaintiff could work a six-hour day.  Dr. Matossian reiterated that

26 she believed Plaintiff could "sit for less than 1 hour for a total

27 of 3 to 3.5 hours, stand 15-30 minutes for 1 to 1.5 hours, and walk

28

16

United States District Court
For the Northern District of California

45 minutes to 1 hour for 2 to 2.5 hours." AR191. She believed that Plaintiff could not perform regular job duties, even on a part-time basis, without causing increased pain, "elevated blood glucose levels, excessive fatigue, and daytime somnolence." AR191. Dr. Matossian stated, "Based on my clinical findings, the recent MRI results, and Ms. Schramm's worsening diabetic status, it is my professional medical opinion that Ms. Schramm cannot sustain full-time employment with regular continuity at this time." Id.

XI. Review of Plaintiff's Appeal and Affirmation of Termination

Defendant requested a review of Plaintiff's file by MES Solutions, Peer Review Services. Two physicians examined Plaintiff's medical records and conducted a conference call with Dr. Matossian.

Dr. Philip Marion, who is board-certified in physical medicine and rehabilitation, reported that Plaintiff "has well-documented cervical, thoracic and lumbar degenerative spine impairments that support the permanent restriction of light capacity occupational activity." AR100. He also concluded the impairments to Plaintiff's left shoulder justified "the restriction of no overhead work activities involving the left upper extremity." Id. He noted that Plaintiff "has not required prescribed analgesic medications for several months." Id. He concluded that Plaintiff was "medically stable with no particular acute medical issues to support any other specific occupational restrictions and limitations." Id.

Dr. Albert Fuchs, who is board-certified in internal medicine, concluded that Plaintiff's hypertension and diabetes did not

17

support any work limitations.  He noted that the "occasional

hypoglycemic symptoms" raised by Dr. Matossian in their conference

call were "not documented to be causing functional limitations and

would not be expected to as long as the claimant had access to

something sweet to ingest."  AR102.  He concluded:

> [T]he claimant and Dr. Matossian maintain that a work
> environment would worsen her glycemic and blood pressure
> control.  A mechanism for this deregulation is difficult
> to imagine in an environment that did not cause physical
> injury, since exercise would be expected to lower
> glucose.  Therefore, no restrictions or limitations are
> supported.

Id.

On March 12, 2009, Defendant affirmed its decision to

terminate Plaintiff's benefits.  It stated that it reviewed the

material submitted along with Plaintiff's appeal and cited the

reports of Drs. Marion and Fuchs.

On May 6, 2009, Plaintiff submitted rebuttal materials to

Defendant for review, including a letter from Dr. Matossian

contesting the conclusions of Drs. Marion and Fuchs.  The

administrative record does not show that Defendant reviewed this

material.

CONCLUSIONS OF LAW

I.   Standard of Review

Pursuant to Federal Rule of Civil Procedure 52, each of the

parties moves for judgment in its favor on Plaintiff's ERISA

claims.  Under Rule 52, the Court conducts what is essentially a

bench trial on the record, evaluating the persuasiveness of

conflicting testimony and deciding which is more likely true.

Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094-95 (9th Cir.

18

1    1999).

2         The parties have stipulated to a <u>de novo</u> standard of review.

3    A court employing <u>de novo</u> review in an ERISA case "simply proceeds

4    to evaluate whether the plan administrator correctly or incorrectly

5    denied benefits."  <u>Abatie v. Alta Health & Life Ins. Co.</u>, 458 F.3d

6    955, 963 (9th Cir. 2006).  Generally, the court's review is limited

7    to the evidence contained in the administrative record.  <u>Opeta v.</u>

8    <u>Nw. Airlines Pension Plan for Contract Employees</u>, 484 F.3d 1211,

9    1217 (9th Cir. 2007).  Evidence outside of the administrative

10   record should only be considered "when circumstances <u>clearly</u>

11   <u>establish</u> that additional evidence is <u>necessary</u> to conduct an

12   adequate de novo review of the benefit decision."  <u>Id.</u> (citation

13   and internal quotation marks omitted; emphasis in original).

14   II.  Discussion

15        A.   Relevant Qualifier for Benefits

16        Under her policy, Plaintiff is considered to have a disability

17   or be disabled if she meets either the "Occupation Qualifier" or

18   the "Earnings Qualifier."  The policy language provides that the

19   Earnings Qualifier may apply when a claimant is employed, but has

20   reduced earnings based on a qualifying injury or sickness.  Because

21   Plaintiff was not working at the time her benefits were terminated,

22   the Earnings Qualifier does not apply to this case.[3]  For its

23   

24        [3] Plaintiff asks the Court, "in its <u>de novo</u> review of the Plan
     provisions," to "interpret the Earnings Qualifier as setting a
25   minimum level of earnings that one must be able to achieve in the
     evaluation of whether one is continuously unable to engage in any
26   occupation for which she may become qualified."  Pl.'s Reply at 23.
     Because the Program's policy language does not require such an
27   interpretation, the Court declines to find such an implied term.

28                                    19

review, the Court accordingly applies the Occupation Qualifier.

B.   Burden of Proof

In an ERISA case involving de novo review, the plaintiff has the burden of showing entitlement to benefits.  See, e.g., Richards v. Hewlett-Packard Corp., 592 F.3d 232, 239 (1st Cir. 2010) (placing burden on plaintiff to prove disability); Juliano v. Health Maint. Org. of N.J., 221 F.3d 279, 287-88 (2d Cir. 2000); Wiley v. Cendant Corp. Short Term Disability Plan, 2010 WL 309670, *7 (N.D. Cal.); Sabatino v. Liberty Life Assurance Co. of Boston, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003).  In conducting de novo review, a court considers various circumstances when weighing evidence.  In Saffon v. Wells Fargo & Co. Long Term Disability Plan, the Ninth Circuit stated that "MetLife had been paying Saffon long-term disability benefits for a year, which suggests that she was already disabled."  522 F.3d 863, 871 (9th Cir. 2008).  The court opined that to find the plaintiff no longer disabled, "one would expect the MRIs to show an improvement, not a lack of degeneration."  Id. (emphasis in original).  This language does not impose a burden of proof on a defendant, but rather demonstrates a logical inference that a court may make based on a specific set of facts.

Thus, in reviewing the administrative record, the Court evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate. Plaintiff, however, carries the ultimate burden to prove that she was disabled under the terms of the Program.

United States District Court
For the Northern District of California

20

C.   Analysis of Plaintiff's Disability

The Court must determine whether Plaintiff was disabled, as defined by her policy, on or about May 1, 2008.  In particular, it must consider whether Plaintiff was "continuously unable to engage in any occupation for which" she is "qualified by education, training or experience."

Plaintiff establishes that she has multiple medical conditions.  Her medical record reflects that she has a history of hypertension; diabetes; carpal tunnel syndrome, for which she has had surgery; various spinal conditions, including but not limited to cervical and thoracic disc degeneration and cervical radiculitis; and abnormalities in her left shoulder, which may require arthroscopic surgery or joint replacement.  Defendant's own reviewing doctors generally agree that Plaintiff has these conditions, concluding that she has hypertension, diabetes, "well-documented cervical, thoracic and lumber degenerative spine impairments that support the permanent restriction of light capacity occupational activity" and "a left shoulder impairment that supports the restriction of no overhead work activities involving the left upper extremity."  AR100-02.

The parties dispute whether these conditions, taken together, render Plaintiff continuously unable to engage in any occupation for which she is qualified.  The Court accords significant weight to the evaluation of Plaintiff by Dr. Pattison, who treated her neck, shoulder and back pain for almost two years.  He consistently stated that Plaintiff had abnormalities in her spine and shoulder. In his July, 2006 report, Dr. Pattison stated that Plaintiff could

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

only sit for a total of less than six hours per eight-hour day and that she would need to avoid "prolonged sitting as this increases her neck discomfort." AR477. He also certified Plaintiff to have a forty percent "whole person impairment." AR474. Although he often noted that Plaintiff could engage in light-duty work, he did not state how he defined this term. In his last report on Plaintiff, he opined that her hypertension, diabetes and sleep problems, in combination with her orthopedic injuries, "may well preclude her from participating in her usual and customary job." AR437.

Dr. Matossian, who had treated Plaintiff since 2005, found significant limits to Plaintiff's functionality. In November, 2007, she concluded that Plaintiff could not sit for more than three to three-and-half hours per day, stand for more than one to one-and-a-half hours per day or walk for more than two to two-and-a-half hours per day. It is true that Dr. Matossian had only been treating Plaintiff's neck, shoulder and back pain for approximately four months when she made this assessment. However, these limits are not inconsistent with Dr. Pattison's conclusions. Moreover, Ms. Buckley, one of Defendant's reviewers, agreed that these restrictions were justified.

The evaluations of Drs. Pattison and Mattosian persuade the Court that, more likely than not, Plaintiff was disabled on May 1, 2008; she could not continuously engage in any occupation for which she was qualified. As noted above, Defendant identified four "sedentary duty skilled occupations" for Plaintiff: counselor, job development specialist, field director and employment agency

22

United States District Court
For the Northern District of California

manager.   AR285.   Because Plaintiff is limited to sitting for no more than three-and-a-half hours per day, the Court is not convinced that she can perform any of these positions, or any sedentary job, on a full-time basis.   In its employability analysis report, Defendant erroneously concluded that Plaintiff could work a thirty-hour workweek, or six-hour workdays.   As noted above, this figure appears to be the sum of the hours Plaintiff could sit, stand and walk, as stated by Dr. Matossian.   Even if Plaintiff could work a six-hour day, she could not sit for more than three-and-a-half hours, and for no more than one hour at a time.   It is not likely, as Defendant appears to assume, that Plaintiff could complete her duties in these sedentary occupations while either standing or walking for the balance of her day.

Defendant challenges Dr. Matossian's assessment, asserting that its sole basis was "plaintiff's own subjective complaints, an issue which by itself is insufficient to support an award of further benefits." Def.'s Reply at 6.   However, Dr. Matossian's notes show that she was aware of more than just Plaintiff's self-reported pain: she knew of Plaintiff's spine and shoulder conditions.   See AR336.   These conditions, which had been consistently recognized by Dr. Pattison, along with Plaintiff's reports of pain, adequately support Dr. Mattosian's conclusion. Indeed, Defendant's attempt to discount Plaintiff's subjective reports of pain is not supported by Ninth Circuit precedent.   See Saffon, 522 F.3d at 872 (stating that "individual reactions to pain are subjective and not easily determined by reference to objective measurements"); Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)

United States District Court
For the Northern District of California

("[D]espite our inability to measure and describe it, pain can have real and severe debilitating effects; it is, without a doubt, capable of entirely precluding a claimant from working.  Because pain is a subjective phenomenon, moreover, it is possible to suffer disabling pain even where the degree of pain, as opposed to the mere existence of pain, is unsupported by objective medical findings.").  Throughout her treatment by Drs. Pattison and Mattosian, Plaintiff consistently reported that she experienced pain.  Although she reported some improvement in her level of pain to Dr. Pattison, she never stated that she was free of it. Notably, Dr. Pattison, along with other doctors, diagnosed Plaintiff with degenerative spinal conditions.  Thus, it is reasonable to infer that, over time, Plaintiff's pain would increase.

Defendant also contends that Dr. Matossian's conclusions contradicted her earlier statements.  In April, 2007, Dr. Matossian estimated, for a state benefits claim, that Plaintiff could return to work on January 1, 2008.  AR384.  This belief does not preclude Dr. Matossian's later conclusions regarding Plaintiff's functioning.  Defendant also notes that Dr. Matossian's records from 2005 did not report that Plaintiff's hypertension and diabetes were disabling.  However, this omission likewise does not preclude Dr. Matossian's finding, two years later, that Plaintiff was functionally limited.

Defendant makes much of Dr. Pattison's assertions that Plaintiff could perform light-duty work.  Although Dr. Pattison opined in October, 2006, after a cursory review of Plaintiff's job

**United States District Court**
For the Northern District of California

description, that he did not find anything that would prevent
Plaintiff from returning to work, he later took a contrary
position.  In a December 9, 2006 report, he noted that Plaintiff
could not return to her usual and customary job because of her
carpal tunnel syndrome.  He further stated that Plaintiff's
multiple conditions "may well preclude her from participating in
her usual and customary job."  AR437.  Thus, even though Dr.
Pattison believed that Plaintiff could return to the workforce, he
never made findings that she had the functionality to engage in any
occupation for which she was qualified.  Nor did Dr. Pattison ever
state that Plaintiff's subjective reports of pain were unfounded.

The Court finds the report of Dr. Clark minimally persuasive.
Although he examined Plaintiff in person, he did not review her
medical records.  He also believed that Plaintiff did not have any
work restrictions for her wrists or hands, despite her carpal
tunnel syndrome.  Plaintiff had not undergone surgery for her
carpal tunnel at the time Dr. Clark examined her, and there is no
evidence that the condition had significantly improved in the six
months since Dr. Pattison concluded that this condition prevented
Plaintiff from returning to work.  Also, Dr. Clark's conclusion
that Plaintiff could perform "light work" did not establish that
she could continuously engage in an occupation for which she was
qualified.  Like Dr. Pattison, Dr. Clark did not define what
constituted "light work."

The Court likewise gives little weight to the opinions of Drs.
Marion and Fuchs.  Although they reviewed Plaintiff's medical
records, they did not examine her in person.  Moreover, the two

25

doctors viewed Plaintiff's conditions in isolation: Dr. Marion solely addressed Plaintiff's orthopedic conditions, whereas Dr. Fuchs focused on her hypertension and diabetes.  They did not address the co-morbid nature of Plaintiff's conditions or whether, as Dr. Pattison suggested, the conditions in combination could preclude Plaintiff from working at her usual and customary job. Nor did Defendant's reviewing doctors either account for Plaintiff's reports of pain or state that her pain had no basis.

Although Defendant did not need to prove a material improvement in Plaintiff's condition to defeat her entitlement to benefits, her lack of consistent, marked progress is probative of her continuing disability.  Like those of the plaintiff in <u>Saffon</u>, Plaintiff's MRIs continued to reflect degenerative conditions that were not expected to improve over time.  This evidence, on its own, does not prove Plaintiff's disability; however, along with the other proof she presents, the lack of consistent improvement lends support for her position.

Finally, Plaintiff's award of Social Security Disability Insurance (SSDI) benefits, based on an administrative law judge's (ALJ) October 15, 2009 ruling, similarly buttresses her showing.[4]

_____

[4] The Ninth Circuit has adopted a <u>de novo</u> scope of review that allows a district court, in its discretion, to consider evidence outside the administrative record in order "to enable the full exercise of an informed and independent judgment." <u>Mongeluzo v. Baxter Travenol Long Term Disability Benefits Plan</u>, 46 F.3d 938, 943 (9th Cir. 1995).  However, a court must not consider evidence outside the administrative record unless "circumstances clearly establish that additional evidence is necessary to conduct an adequate <u>de novo</u> review of the benefit decision." <u>Id.</u> at 944 (quoting <u>Quesinberry v. Life Ins. Co. of N. Am.</u>, 987 F.2d 1017, 1025 (4th Cir. 1993)).  The Court considers Plaintiff's award of SSDI benefits because it constitutes additional evidence that she

In his decision, the ALJ found Plaintiff to be disabled, under the Social Security Act, since February 16, 2005. Defendant correctly notes that the standard applied to Plaintiff's SSDI claim differs from that applicable under her policy. However, notwithstanding this difference, her entitlement to SSDI benefits suggests that she suffers from some limitation on her ability to work. Again, although this award does not constitute direct proof, it reinforces Plaintiff's showing that she had a disability that could qualify her for benefits under her policy.

Accordingly, the Court is persuaded that Plaintiff, more likely than not, was disabled under the Program's terms as of May 1, 2008. Plaintiff presents evidence of her disability, and Defendant does not persuade the Court that Plaintiff's or her treating physicians' statements are not credible. She is therefore entitled to the restoration of her long-term disability and "Waiver of Premium" benefits as of May 1, 2008.

D.   Entitlement to Pre-judgment Interest

A district court may award pre-judgment interest on past-due benefits in ERISA cases. The decision whether to award such interest is "a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities." Landwehr v. DuPree, 72 F.3d 726, 739 (9th Cir. 1995) (quoting Shaw v. Int'l Ass'n of Machinists & Aerospace Workers Pension Plan, 750 F.2d 1458, 1465 (9th Cir. 1985)). The Court finds that the equities support an award of pre-judgment interest in this case.

could not have presented in the administrative process. See Opeta, 484 F.3d at 1217.

27

United States District Court
For the Northern District of California

"Generally, the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest . . . ." Blankenship v. Liberty Life Assurance Co. of Boston, 486 F.3d 620, 628 (9th Cir. 2007).  This section provides that interest is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. [sic] the date of the judgment." 28 U.S.C. § 1961(a).  In Nelson v. EG & G Energy Measurements Group, Inc., 37 F.3d 1384, 1391 (9th Cir. 1994), the court stated:

> EG & G argues that the pre-judgment interest rate should have been calculated at the 52-week Treasury bill rate[5] as of the time of judgment, which was 3.51 percent.  This does not correspond with the approach taken in Western Pacific Fisheries[, Inc. v. S.S. President Grant, 730 F.2d 1280, 1289 (9th Cir. 1984)].  In that case, insurance underwriters had paid out funds for which they sought reimbursement.  The interest rate utilized for the pre-judgment interest was the average 52-week Treasury bill rate operative immediately prior to the date of payment by the underwriters.  This makes good sense because pre-judgment interest is intended to cover the lost investment potential of funds to which the plaintiff was entitled, from the time of entitlement to the date of judgment.  It is the Treasury bill rate during this interim that is pertinent, not the Treasury bill rate at the time of judgment.  The Treasury bill rate at the time of judgment has no bearing on what could have been earned prior to judgment.
>
> The method of calculating the pre-judgment interest utilized by the district court reasonably reflected this approach.  The interest due was calculated as though the plaintiffs had invested the withheld funds at the 52-week Treasury bill rate and then reinvested the proceeds

---

[5] At the time Nelson was decided, 28 U.S.C. § 1961(a) provided that the applicable interest rate was "the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment."

28

United States District Court
For the Northern District of California

> annually at the new rate.  This reasonably reflects the conservative investment income the plaintiffs would have been able to have earned had they received the funds on September 30, 1987.

37 F.3d at 1391-92.

Thus, Plaintiff is due interest equivalent to that which would have accrued if she had invested her benefits at a rate equal to the weekly average 1-year constant maturity Treasury yield on the date the benefits were due to her, and then reinvested the proceeds annually at a rate equal to the weekly average 1-year constant maturity Treasury yield at the time of the reinvestment, up to the date on which Defendant satisfies the judgment.

CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's Motion for Judgment (Docket No. 28) and DENIES Defendant's Cross-Motion for Judgment (Docket No. 36).  Plaintiff qualifies for continued long-term disability benefits under the terms of the Program.  She is entitled to an award of her long-term disability benefits from May 1, 2008 through the entry of judgment, plus pre-judgment interest calculated in the manner discussed above.  Plaintiff is also entitled to a reinstatement of her waiver of life insurance premium claim benefits under the Program.

Defendant shall calculate the amount of past benefits and interest due in the first instance and the parties shall file a stipulated form of judgment within fourteen days of the Court's Order, unless a dispute concerning the amount due arises and cannot be resolved without Court intervention, in which case the parties may move for appropriate relief.

29

1    Plaintiff may file a motion for attorneys' fees and costs
2  within fourteen days of entry of judgment.  As the successful party
3  in this action, she is entitled to move to recover the reasonable
4  attorneys' fees and costs she has incurred in prosecuting this
5  action, the amount of which shall be determined by post-judgment
6  motion.  29 U.S.C. § 1132(g)(1); Smith v. CMTA-IAM Pension Trust,
7  746 F.2d 587, 589 (9th Cir. 1984).  Pursuant to Civil Local Rule
8  54-5, the parties are ordered to meet and confer regarding
9  Plaintiff's motion for attorneys' fees within fourteen days of
10  entry of judgment.

11    IT IS SO ORDERED.

12

13  Dated: June 14, 2010

14                              CLAUDIA WILKEN
                               United States District Judge